UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| CUSTOM VEHICLES, INC., )<br>)<br>Plaintiff )<br>)<br>vs. )<br>)<br>FOREST RIVER, INC., )<br>)<br>Defendant ) | CAUSE NO. 3:03-CV-771RM |

OPINION AND ORDER

Custom Vehicles, Inc. sued Forest River, Inc. for infringement of a registered trademark, 15 U.S.C. § 1114, and infringement by use of a trademark to confuse or mislead, 15 U.S.C. 1125(a). For the reasons that follow, the court grants Forest River's summary judgment motion.

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. Ritchie v. Glidden Co., 242 F.3d 713, 720 (7th Cir. 2001). "The

1

mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the non-movant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004). The party with the burden of proof on an issue must show that there is enough evidence to support a jury verdict in his favor. Lawrence v. Kenosha County, 391 F.3d 837, 842 (7th Cir. 2004); see also Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003) ("summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events") quoting Schacht v. Wisconsin Dep't of Corr., 175 F.3d 497, 504 (7th Cir. 1999).

THE MOTION TO STRIKE

Before setting forth the facts in the light most favorable to Custom Vehicles (the non-moving party), the court must identify the summary judgment record from which those facts are to be drawn. Custom Vehicles has moved to strike portions of Forest River's submission.

Forest River cites Custom Vehicles' complaint as authority for the proposition that Forest River's use of the mark began in October 2002. Custom Vehicles objects, noting that Forest River's answer denied that allegation, and that Forest River never amended that answer. Forest River responds that it denied ¶ 11 of the complaint, and that ¶ 11 had to be denied because it was misleading. Forest River's response is less persuasive than it might be; answers are to admit

2

or deny a complaint's allegations, not inferences that someone might draw from the allegation, and Forest River's responses to other allegations in the complaint clarified the extent of its admissions. Nonetheless, Custom Vehicles' argument becomes too circular to apply: if Forest River cannot deny its denial because it is a binding judicial admission, neither can Custom Vehicles deny its own allegation. If both parties are fully estopped, neither can prevail on this issue. Accordingly, the court declines to strike Forest River's submission to the extent it relies on ¶ 11 of Custom Vehicles' complaint.

Custom Vehicles next objects to Forest River's reliance on Forest River's answer to Interrogatory #8, contending that it conflicts with the deposition testimony of Forest River's Rule 30(b)(6) witness, Curt Smith. Interrogatory #8 asked Forest River to identify by date and location each trade show in which it marketed its Work and Play products; Forest River answered that it marketed its product at "the RVIA trade shows in Louisville., Kentucky during the first week of December 2003 and 2002...." At the deposition, the following questions and answers were asked:

> Q    In what year was the first trade show at which Forest River presented a Work and Play product?
> A    2003
> Q    Where was it?
> A    Louisville.

Of course, a party may not use an affidavit (or, presumably, written discovery) to contradict the affiant's deposition testimony. Ineichen v. Ameritech, 410 F.3d 956 (7th Cir. 2005). For two reasons, though, the court agrees with

3

Forest River that Mr. Smith's testimony doesn't render nugatory the answer to Interrogatory #8.

First, while Custom Vehicles relies on a line of cases that addresses the use of an affidavit to repair earlier deposition testimony, Forest River's interrogatory response preceded Mr. Smith's deposition. Forest River seeks to rely on the earlier response, not the latter. A doctrine meant to keep attorneys' words from patching up unfavorable words by parties and witnesses seems ill-suited to the use Custom Vehicles wishes to make of it. Second, the answers are not irreconcilable; the questions asked in the interrogatory and at the deposition differ. The court declines to strike the use of the interrogatory answer.

Finally, Custom Vehicles objects to Forest River's reliance on a letter Forest River's attorney sent to supplement a discovery response. Forest River's submission of Curt Smith's affidavit, which contains the same information, rendered that objection moot.

For the foregoing reasons, the court denies Custom Vehicles' motion to strike, and turns to the substance of the summary judgment motion.

SUMMARY JUDGMENT MOTION: SECONDARY MEANING

Today, Terry Minix is Custom Vehicles' president and owner. Before that, he was involved in J.T. Custom Works, Inc., a venture that entered the recreational vehicle market around 1989. In early 1999, Mr. Minix began taking the first steps to produce a prototype of a concept vehicle he called the "Work-N-

Play" — a van conversion designed to function as a mobile office or work station that the user could convert, with little effort, into a recreational vehicle by changing or configuring the internal components. Seating, furnishings, and other components were installed in a modular track system for easy removal or interchange.

In March 2000, J.T. Custom Works applied for a federal trademark registration for the mark "work-n-play" as applied to vehicle conversion services. J.T. Custom Works hadn't actually used the mark at that point. J.T. Custom Works sold a camper/mobile office van on September 22, 2000; that was J.T. Custom Works' only sale with the "work-n-play" mark. That customer hadn't seen any advertisement of "work-n-play" products or services when he first visited J.T. Custom Works. It was during that visit Mr. Minix described "work and play" van; the customer was shown a van that was usable both for office work and as a camper.

J.T. Custom Works used the "work-n-play" mark only to try to sell conversion van products that used its patented modular component system. It advertised that it "designed the "work-n-play" to work out of everyday and then play out of it on the weekends and on vacations," and used the slogan "work out of it through the week and play out of it on the weekends." The advertising said "that most working people have the opportunity to camp, tail-gate, etc. a limited time per year. With this in mind we designed the Work-N-Play system to allow the customer the convince [sic] to configure the vehicle floor plan to their own

5

particular needs. Work out of it through the week 'Mobile Office' and Camp out of it on Weekends." J.T. Custom Works didn't use the "work-n-play" mark to advertise vehicle conversion services.

In early spring 2000, J.T. Custom Works advertised the vehicle in a regional catalogue that retail dealers display in their showrooms. Throughout 2001, J.T. Custom Works advertised the product in RV Business, a monthly nationwide industry magazine distributed to dealers, though the content of that advertisement isn't in the record. J.T. Custom Works also put together a series of brochures and flyers and a video recording promoting the product line by name, which were provided to scores of dealers at tradeshows and in personal sales calls.

Recreational vehicles manufacturers market and sell their product through retail dealers, and establishing a network of dealers takes time and effort. Manufacturers participate in annual regional and national industry trade shows where prospective dealers can view products. Wholesale trade shows are the industry's primary marketing tool because of the retail dealers' role in selling to consumers. Of the dozen annual trade shows, the most prestigious is held in Louisville, Kentucky.

Mr. Minix has tried to promote the Work-N-Play line of vehicles among retail dealers since early 1999 by getting local media to publish information about the product, advertising the product in industry publications and on Custom Vehicles' website starting in August 2003, participating in industry trade shows throughout the country, and personally calling upon dealers. From early 1999 to December

6

2003, Mr. Minix attended and made formal presentations at more than 20 tradeshows around the country, interacting with hundreds of dealers. Steve Houser assisted Mr. Minix in promoting the product line to dealers in three states, promoting the product to 35 to 50 dealers, armed with promotional materials that included a February 4, 2001 Elkhart Truth article that discussed the "Work-N-Play" product and Custom Vehicles. Custom Vehicles advertised 'work-n-play" products as "multiple use vehicles" that can be "repositioned" between weekend campers and a mobile office.

J.T. Custom Works went out of business, and Custom Vehicles, Inc. bought its assets, including the "work-n-play" mark. Forest River began using the "work-n-play" mark in 2002, describing travel trailers at trade shows and selling more than $1 million worth of its products. Custom Vehicles didn't sell any products under the "work-n-play" mark until 2004, and sold the used J.T. Custom Works "work-n-play" demo van to a family member in 2003.

In December, 2004, Mr. Houser and Mr. Minix attended the Louisville trade show to promote the "Work-N-Play" van. They encountered scores of dealers and part suppliers, some of whom had discussed the "Work-N-Play" product with Mr. Houser or Mr. Minix in 2001 and 2002. Forest River also participated in the trade show, promoting its "Work and Play" line of trailers. A large majority of the dealers asked Mr. Minix and Mr. Houser whether they were part of Forest River; Alex Foris of a bus manufacturer, heard similar questions from dealers after Forest River

introduced its line of products. Upon learning that Custom Vehicles wasn't part of Forest River, the inquiring dealers lost interest and left.

Although J.T. Custom Works applied for trademark registration for its mark, registered marks that are "merely descriptive" of the goods or services to which they relate are not to be registered, 15 U.S.C. 1052(e), and Forest River concedes that its mark is merely descriptive. A descriptive mark gains trademark protection if it acquires secondary meaning in the collective consciousness of the relevant community. Platinum Home Mtg. Corp. v. Platinum Financial Group, Inc., 149 F.3d. 722, 727 (7th Cir. 1998). A mark has secondary meaning if consumers understand the mark to signify the product's origin, rather than just its attributes. Bretford Mfg., Inc. v. Smith System Mfg. Corp., 419 F.3d 576, 579 (7th Cir. 2005). In deciding whether secondary meaning has been acquired, courts may consider the amount and manner of advertising, sales volume, length and manner of use, consumer testimony, and consumer surveys. Platinum Home v. Platinum Financial, 149 F.3d at 728 (*citing* Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F. 2d 1079, 1085 (7th Cir. 1988)).

As the party seeking trademark protection, Custom Vehicles bears the burden[1] of proving that secondary meaning has attached. Boston Beer Co. Ltd.

---

[1] Custom Vehicles says Forest River has the burden of proving the absence of secondary meaning before its entry into the market because the senior user of the mark is afforded a presumption that secondary meaning existed. The court reads Custom Vehicles' cited authority differently: "Once a mark is registered, the Act affords a plaintiff one of two presumptions: (1) that her registered trademark is not merely descriptive or generic; or (2) that if descriptive, the mark is accorded secondary meaning. . . . The defendant may overcome this presumption with evidence that the mark is merely generic or descriptive, or that it lacks secondary meaning." Packman v. Chicago Tribune Company, 267 F.3d 628 (7th cir 2001) *citing* Liquid Controls Corp.

Partnership v. Slesar Bros Brewing Co., 9 F.3d 175, 182 (1st Cir. 1993) (*citing* Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F. 2d 1033, 1041 (2d Cir. 1992)). Custom Vehicles must prove that secondary meaning existed before Forest River first began to use the mark. *See* Perini Corp. v. Perini Const., Inc., 915 F.2d 121 (4th Cir. 1990); Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc., 871 F. 2d 590, 596 (6th Cir. 1989).

The summary judgment record would not allow a reasonable trier of fact to find that the "work-n-play" mark had achieved secondary meaning before Forest River began to use it. Mr. Minix's testimony, corroborated by Mr. Houser, indicates that he (on behalf of J.T. Custom Works and Custom Vehicles) was trying to market the product that carried the mark before Forest River began using the mark, though it is less clear how much he used the mark in doing so. In any event, the other factors for determining secondary meaning all weigh heavily — indeed, conclusively — against any finding of secondary meaning.

Despite Mr. Minix's efforts, sales value of the mark was nil before Forest River entered the picture. A single sale had been achieved. No dealers had signed up. No sales can be found to have come from any of the advertising or trade show appearances. Custom Vehicles didn't begin to sell products with the "work-n-play" mark until 2004, after Forest River was reaping millions in sales of its product.

---

v. Liquid Control Corp., 802 F.2d 934, 936 (7th Cir. 1986). Custom Vehicles concedes that its mark was merely descriptive, so any presumption is overcome.

9

The experiences that Mr. Minix, Mr. Houser, and Mr. Foris report with dealer questions and behavior in 2004 indicate that to the extent "work-n-play" had developed secondary meaning in the relevant market — indicia of origin rather than feature — Forest River was the suggested origin, not Custom Vehicles. Dealers who saw the mark on the Custom Vehicles products assumed that those were Forest River products. Perhaps confusion ran the other way, as well, but the summary judgment record includes no evidence of dealers who thought Forest River was selling the Custom Vehicles product by virtue of Forest River's use of the mark.

Because the summary judgment record would not allow a reasonable trier of fact to find that the "work-n-play" mark had achieved secondary meaning before Forest River began using it, Custom Vehicles cannot succeed, regardless of the outcome of any other factual disputes. Forest River is entitled to judgment on Custom Vehicles' claims, and the court GRANTS the defendant's motion for summary judgment [docket #54] and DENIES the plaintiff's motion to strike [docket #54-5]. The defendant did not move for summary judgment on its counterclaim and the counterclaim appears to remain in the case, so the case shall remain at issue on the counterclaim and the plaintiff's reply.

SO ORDERED.

ENTERED:   December 2, 2005

        /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court

cc:    P. O'Leary
       R. Fountain